IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

OLLIE SUE THARP     )
            )
v.            )   No. 2:11-0056
            )
MICHAEL J. ASTRUE,    )
  Commissioner of Social Security )

To: The Honorable Thomas A. Wiseman, Jr., Senior District Judge

## REPORT AND RECOMMENDATION

The plaintiff filed this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the plaintiff's claims for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI"), as provided by the Social Security Act ("the Act").

Upon review of the Administrative Record as a whole, the Court finds that the Commissioner's determination that the plaintiff is not disabled under the Act is supported by substantial evidence in the record as required by 42 U.S.C. § 405(g), and that the plaintiff's motion for judgment on the administrative record (Docket Entry No. 12) should be denied.

## I. INTRODUCTION

The plaintiff filed applications for DIB and SSI on August 20, 2008, alleging an onset date of August 15, 2004, due to degenerative bone disease, fibromyalgia, depression, acid reflux, and "arthritis of spine, legs, [and] feet." (Tr. 106-15, 133, 166.) Her applications were denied initially

and upon reconsideration. (Tr. 48-53, 58-61.) A hearing before Administrative Law Judge ("ALJ") Robert L. Erwin was held on February 24, 2010. (Tr. 22-43.) The ALJ delivered an unfavorable decision on April 1, 2010 (tr. 10-17), and the plaintiff sought review by the Appeals Council. (Tr. 102-04.) On April 12, 2011, the Appeals Council denied plaintiff's request for review (tr. 1-3) and the ALJ's decision became the final decision of the Commissioner.

## II. BACKGROUND

Plaintiff was born on June 15, 1973, and was 31 years old as of August 15, 2004, her alleged onset date. (Tr. 27, 106.) The plaintiff completed her GED and worked as a sewing machine operator, production worker, and certified nursing assistant. (Tr. 134, 139.)

### A. Chronological Background: Procedural Developments and Medical Records

Between May of 2003, and November of 2006, the plaintiff presented to Cookeville Medical Center on multiple occasions with complaints of back and foot pain, urinary difficulty, Achilles tendon pain, headaches, dizziness, abdominal pain, and shortness of breath. (Tr. 220-74.) Upon examinations, her spine was tender and her foot and spine had a decreased range of motion. *Id.* A CT scan of her abdomen revealed a "[b]enign right adrenal adenoma" (tr. 257), a scan of her lumbar spine showed mild osteoarthritis, an x-ray of her lower spine revealed "minimal degenerative changes at the level of L3 and L5," and an x-ray of her chest showed possible pneumonia and possible chronic obstructive pulmonary disease ("COPD"). (Tr. 226, 235.) She was diagnosed with lower back pain, a back strain, lumbar disc disorder with myelopathy, Achilles tendinitis,

2

"[a]rthropathy involving multiple sites,"[1] chronic sinusitis not otherwise specified ("NOS"), abdominal pain, esophageal reflux, irritable bowel syndrome, anxiety, pelvic inflammatory disease, and endometriosis and prescribed Naproxen, Flexeril, Prevacid, Protonix, Zantac, Paxil, Toradol, Hydrocodone, Colace, and Reglan.[2] (Tr. 220-74.) A June 2007, x-ray of the plaintiff's pelvis revealed "[n]o fractures or dislocations" and a CT scan of her spine was normal. (Tr. 359-60.)

On August 3, 2007, the plaintiff presented to Dr. Matthew J. Gaspar, at Twin Lakes Family Practice PC ("Twin Lakes") in Livingston, Tennessee, with complaints of back pain. (Tr. 432-34.) Dr. Gaspar had apparently previously referred the plaintiff to Dr. D. Elizabeth Orsburn, who thought the plaintiff had plantar fasciitis and ordered an MRI that revealed a bulging disc. Dr. Orsburn also examined the plaintiff on August 22, 2007, for her complaints of back pain, and diagnosed her with degenerative disc disease and radiating lower back pain and prescribed Lyrica.[3] (Tr. 318.)

Between August and November of 2007, Dr. Gaspar diagnosed the plaintiff with foot pain, plantar fasciitis, musculoskeletal neck disorder, lower back pain, and headaches, and prescribed Hydrocodone and Skelaxin.[4] (Tr. 420-34.) On September 24, 2007, Dr. Gaspar noted that the

---

[1] Arthropathy is "any joint disease." Dorland's Illustrated Medical Dictionary 156 (30th ed. 2003) ("Dorland's").

[2] Naproxen is a nonsteroidal anti-inflammatory drug ("NSAID") prescribed for osteoarthritis and rheumatoid arthritis, Flexeril is a skeletal muscle relaxant; Prevacid, Protonix, and Reglan are prescribed for gastroesophageal reflux disease ("GERD"); Zantac is used to treat ulcers; Paxil is prescribed for depression and general anxiety disorder; Toradol is a NSAID that is used to treat "moderately severe acute pain;" Hydrocodone is a narcotic analgesic; and Colace is a stool softener. Saunders Pharmaceutical Word Book 175, 294, 352, 479, 536, 579, 590, 607, 712, 773 (2009) ("Saunders").

[3] Lyrica is prescribed to relieve neuropathic pain. Saunders at 420.

[4] Skelaxin is a skeletal muscle relaxant. Saunders at 646.

3

plaintiff "has so many complaints each time she visits that it is hard to keep track of her problems. It appears that I've never solved any of her problems. She requests pain pills to 'tie (her) over' until she can see the specialist. She is beyond my abilities and I will have to rely on the specialists [sic] expertise." (Tr. 427.) A November 2007, x-ray of the plaintiff's right foot showed Achilles tendinitis and plantar fasciitis. (Tr. 361.)

Upon referral from Dr. Gaspar, Dr. John Thompson, with the White County Physician Service, diagnosed her with a "painful nonunion fracture" and performed surgery in September of 2007, to insert compression screws in her left foot. (Tr. 320-25, 332.)

In March and April of 2008, the plaintiff returned to Dr. Gaspar on two occasions with complaints of "severe and nonradiating" lower back pain; severe neck pain and discomfort that was aggravated by bending, lifting, sitting, and straining; and elevated lipid levels. (Tr. 412-19.) X-rays of the plaintiff's pelvis, cervical spine, and lumbar spine were all "[n]ormal." (Tr. 444.) Dr. Gaspar diagnosed her with back pain, intervertebral disc displacement, degeneration of the cervical intervertebral disc, hyperlipidemia, lumbago, and chronic pain syndrome, and prescribed Simvastatin, Naproxen, Ergomar, Skelaxin, Flexeril, and Diclofenac.[5] (Tr. 334-41.) However, despite his assessment of chronic pain syndrome, he noted on his last progress notes in the record on April 15, 2008, that the plaintiff had "no outward manifestation of pain at present" and thus "she is functional." (Tr. 337.)

Between May and August of 2008, the plaintiff presented to Dr. Samantha E. McLerran with Twin Lakes on multiple occasions with complaints of bone, joint, neck, ankle and back pain, and

---

[5] Simvastatin is used to treat hyperlipidemia, Ergomar is used to treat migraines and vascular headaches, and Diclofenac is a NSAID prescribed for acute pain. Saunders at 223, 267, 644.

4

"aching all over." (Tr. 389-408, 435-39.) Dr. McLerran noted that the plaintiff had moderate bilateral tenderness and "moderately reduced" spine-flexion and extension in her lumbar spine, was depressed, and had negative straight leg raises and a normal gait. (Tr. 391, 395, 401.) X-rays of her left and right ankle revealed osteoarthritis and "[r]ight Achilles tendonitis," and an MRI of her lumbar spine showed "[m]ild degenerative bony and disc space changes." (Tr. 403-04.) Dr. McLerran diagnosed the plaintiff with obesity, arthropathy, lower back pain, osteoarthritis, and fibromyalgia, and prescribed Cimetidine, Sulindac, Zanaflex, Tramadol, Omeprazole,[6] and Hydrocodone. (Tr. 389-408, 435-39.)

On October 20, 2008, Dr. Carol A. Lemeh, a nonexamining Disability Determination Services ("DDS") consultative physician, completed a physical Residual Functional Capacity ("RFC") assessment (tr. 448-55) and opined that the plaintiff could lift/carry 50 pounds occasionally and 25 pounds frequently, could stand/walk/sit for six hours in an eight hour workday, had unlimited ability to push/pull, and should avoid concentrated exposure to fumes, odors, dust, gases, and poor ventilation. (Tr. 449, 452.) Dr. Jeffrey P. Wright, Ph.D., a nonexamining DDS consultative psychologist, completed a Psychiatric Review Technique Form ("PRTF") (tr. 456-69) and opined that the plaintiff had symptoms of depression, although she had never been formally diagnosed with depression. (Tr. 459.) Dr. Wright determined that the plaintiff had no restriction of activities of daily living or episodes of decompensation and mild difficulty in maintaining social functioning, concentration, persistence, or pace. (Tr. 466.)

---

[6] Cimetidine is used to treat ulcers; Sulindac is a NSAID prescribed for arthritis, tendinitis, and other inflammatory conditions; Tramadol is prescribed for moderate to severe pain; and Omeprazole is used to treat GERD. Saunders at 160, 510, 671, 715.

Between September and November of 2008, the plaintiff presented to Dr. McLerran on multiple occasions with complaints of abdominal pain, nausea, uncontrollable acid reflux, arm and leg pain, a depressed mood, excessive irritability, and anxiety. (Tr. 502-32.) The plaintiff underwent a colonoscopy, which revealed that she had hemorrhoids (tr. 510), and Dr. McLerran noted that her mood and affect fluctuated between being depressed and normal and appropriate. (Tr. 504, 508, 531.) Dr. McLerran diagnosed the plaintiff with abdominal pain and tenderness, acute stress reaction, obesity, osteoarthritis, lower back pain, fibromyalgia, and esophageal reflux and prescribed Paxil, Hydrocodone, Zanaflex, Nortriptyline, Nexium, Lunesta, and Neurontin.[7] (Tr. 502-32.)

Dr. McLerran referred the plaintiff to Dr. Barton M. Clements, a general surgeon, with the Livingston Regional Hospital in September of 2009, for a gastroenterology evaluation as a result of abdominal pain that she had experienced for two months. (Tr. 588, 604.) Dr. Clements diagnosed the plaintiff with dyspepsia and dysphagia and performed an Esophagogastroduodenoscopy ("EGD") that revealed that the plaintiff had moderately severe gastritis and minimal reflux esophagitis. (Tr. 601-07.) On October 6, 2009, plaintiff returned to Dr. Clements and related that her "pain with eating is unchanged" and that she had nausea and upper abdominal pain. (Tr. 598.) Dr. Clements diagnosed the plaintiff with gastritis and esophageal spasms. (Tr. 600.) An October 7, 2009, x-ray of the plaintiff's upper abdomen showed a "[n]ormal swallowing mechanism," esophageal spasm, and "[h]iatal hernia with gastroesophageal reflux and a mild distal esophagitis." (Tr. 597.) The plaintiff returned to Dr. Clements on October 9, 2009, with esophageal spasms and related that her

---

[7] Paxil is prescribed for depression, panic disorder, and anxiety; Zanaflex is a skeletal muscle relaxant; Nortriptyline is an antidepressant; Nexium is prescribed for GERD; Lunesta is used to treat insomnia; and Neurontin is an anticonvulsant that is used to treat seizures and neuralgia. Saunders at 418, 488-89, 500, 536, 773.

symptoms were unchanged. (Tr. 594.) Dr. Clements diagnosed the plaintiff with esophageal spasms and a left breast abcess. (Tr. 596.)

Upon referral from Dr. McLerran, the plaintiff presented to Dr. Melvin Williams, a podiatrist, on October 30, 2009, with complaints of bilateral foot pain from "toenail fungus."(Tr. 581.) Dr. Williams found that the plaintiff's muscle strength was 5/5, right ankle range of motion was normal, and left ankle range of motion was decreased. *Id.* He diagnosed the plaintiff with left foot tendinitis and an ingrown toenail, and excised two toenails on her left foot. *Id.*

In November and December of 2009, and in February of 2010, the plaintiff presented to Dr. Clements for follow-up evaluations of her esophageal spasms and related that, although her "spasms are better," she was having "some heartburn and abdominal pain." (Tr. 583-93.) Dr. Clements noted that she had "moderate abdominal obesity;" diagnosed her with GERD, esophageal spasms, and acute sinusitis; and prescribed Procardia.[8] *Id.*

Upon referral from her attorney, the plaintiff presented to Dr. Michael T. Cox on January 13, 2010, with complaints of back, feet, and leg pain, and related that she was able to sit for one hour, stand less than 30 minutes, and "occasionally lift but notes that her hands give way easily." (Tr. 570-71.) Dr. Cox noted that she had "some difficulty" standing on her heels and toes and balancing on either foot, "no deterioration in range of motion," and "significant problems with subjective pain on movement but no other visible deformities." (Tr. 571.) He diagnosed her with "[f]ibromyalgias with resultant disability" and esophageal spasms. *Id.*

Dr. Cox completed a Fibromyalgia RFC assessment (tr. 572-75) and noted that the plaintiff met the American College of Rheumatology criteria for fibromyalgia, was not expected to improve,

---

[8] Procardia is prescribed for angina or hypertension. Saunders at 582.

7

and had multiple trigger points on exam and found that her symptoms included multiple tender

points, chronic fatigue, morning stiffness, muscle weakness, and anxiety. (Tr. 572.) He determined

that the plaintiff had moderate bilateral pain in her lumbosacral spine, cervical spine, thoracic spine,

chest, shoulders, hips, legs, knees, ankles, and feet, and that this pain was precipitated by stress,

fatigue, movement, overuse, and cold. (Tr. 573.) Dr. Cox described plaintiff's pain as severe enough

that it would frequently interfere with the attention and concentration needed to perform simple work

tasks in a typical workday but concluded that plaintiff could tolerate moderate stress at work. *Id*. He

found that the plaintiff could walk one half of a city block before needing to rest or experiencing

severe pain; was able to sit for 30 minutes "before needing to get up;" could stand for 15 minutes

"before needing to sit down [or] walk around;" could stand/walk about two hours and sit at least six

hours in an eight hour day; needed to walk around every 30 minutes for at least five minutes each

time; needed "a job that permits shifting positions at will from sitting, standing or walking;" and

would have to take unscheduled breaks "every hour as needed" for 15 minutes each time. (Tr. 574.)

Dr. Cox concluded that the plaintiff could lift/carry less than ten pounds frequently and ten pounds

occasionally; could rarely twist, stoop, crouch, squat, and climb ladders or stairs; could occasionally

look down, turn her head left or right, look up, or hold her head in a "static position;" had no

"significant limitations with reaching, handling, or fingering;" and would be absent from work

"[a]bout four days per month." (Tr. 575.)

On February 4, 2010, Dr. Clements completed a Crohn's and Colitis RFC assessment

(tr. 576-80) and diagnosed the plaintiff with esophageal spasms, esophagitis, and atypical chest

pains. (Tr. 576.) He noted that the plaintiff's long term prognosis was fair and that her symptoms

included abdominal pain and cramping that radiated up her chest, malaise, and fatigue and were

8

severe enough to interfere often with her attention and concentration but that she was capable of tolerating low stress jobs. (Tr. 577-578.) Dr. Clements determined that the plaintiff could walk less than one block without resting, stand for five minutes at one time, and stand/walk less than two hours in an eight hour workday; was able to sit for thirty minutes at one time; and "need[ed] a job which permits shifting positions at will from sitting, standing or walking" and "ready access to a restroom." (Tr. 578-79.) He found that the plaintiff would need to lie down "daily" at work, could occasionally lift/carry ten pounds, should never climb ladders and rarely twist or climb stairs, could occasionally stoop or crouch, and would miss more than four days of work per month. (Tr. 579-80.)

**B. Hearing Testimony**

At the hearing before the ALJ, the plaintiff was represented by counsel, and the plaintiff and Mr. Ed Smith, a vocational expert ("VE"), testified. (Tr. 23-43.) The plaintiff related that she weighed 303 pounds, had her driver's license revoked eight years ago, took some nursing assistant classes, and had worked at a nursing home but left her job because she had endometriosis. (Tr. 27-29.) Her last job was as a sewing machine operator, which she left because there were not enough hours for her to work. (Tr. 30.) The plaintiff testified that she is not able to work because of back, feet, and leg pain, and fibromyalgia, and that the pain medication she takes "seems to help, but sometimes it's really not." (Tr. 30-31.) She related that she is able to "walk a little bit and then [] sit a little bit," has difficulty breathing and uses an inhaler but still smokes two to three packs of cigarettes a day, and receives help from her husband and children when doing household chores. (Tr. 31-33.)

9

The plaintiff testified that she is able to walk 50 feet at a time and lift five pounds, experiences pain when sitting and has to stand up and move around every 45 minutes, and has difficulty dressing herself and showering and that her leg and hip give out if she walks too far. (Tr. 33-36.) She related that she has "a lot of pain in [her] upper stomach and on up in my chest and in my side," difficulty keeping food down, diarrhea, and constipation, and that although Phenergan[9] helps relieve her diarrhea and throwing up, it also makes her drowsy. (Tr. 37-38.)

The VE classified the plaintiff's past relevant work as production worker as light and unskilled and as a sewing machine operator as light and unskilled. (Tr. 40.) The ALJ asked the VE what type of work the plaintiff could perform if she were "limited to a range of medium work [and] . . . would have to avoid concentrated exposure to dust, fumes, smoke, chemicals or noxious gases because of the asthma she has." *Id.* The VE answered that the plaintiff could return to her job as a sewing machine operator but would be precluded from working as a production worker, and that she could also perform work at the unskilled level as a hand packager, store laborer, and linen room attendant. (Tr. 41.)

Next, the ALJ asked the VE what type of work the plaintiff could perform given the limitations in Dr. Cox's Fibromyalgia RFC assessment and he answered that the plaintiff would be precluded from working. (Tr. 41-42.) The VE also testified that the plaintiff would be precluded from working if Phenergan caused her to fall asleep for an hour during each workday. (Tr. 42.)

_____

[9] Phenergan is an antiemetic or antinauseant. Saunders at 551.

10

## III. THE ALJ'S FINDINGS

The ALJ issued an unfavorable decision on April 1, 2010. Based on the record, the ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through September 30, 2006.

2. The claimant has not engaged in substantial gainful activity since August 15, 2004, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

\* \* \*

3. The claimant has the following severe impairments: fibromyalgia and asthma (20 CFR 404.1520(c) and 416.920(c)).

\* \* \*

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

\* \* \*

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except the claimant should avoid concentrated exposure to dust, fumes, smoke, chemicals, or noxious gases. She can lift and carry 50 pounds occasionally and 25 pounds frequently. She can sit for six hours, and stand/walk for two hours in an eight hour day.

\* \* \*

6. The claimant is capable of performing past relevant work as a sewing machine operator. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

\* \* \*

11

7. The claimant has not been under a disability, as defined in the Social Security Act, from August 15, 2004, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(Tr. 10-17.)

# IV. DISCUSSION

## A. Standard of Review

The determination of disability under the Act is an administrative decision, and the only questions before this Court are whether the decision of the Commissioner is supported by substantial evidence and whether the Commissioner employed the proper legal standards in reaching his conclusion. 42 U.S.C. § 405(g). *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed. 2d 842 (1971) (adopting and defining substantial evidence standard in context of Social Security cases); *Kyle v. Comm'r Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010). The Commissioner's decision must be affirmed if it is supported by substantial evidence, "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Blakely v. Comm'r of Soc. Sec.,* 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir.1997)); *Jones* v. *Comm'r of Soc. Sec.,* 336 F.3d 469, 477 (6th Cir. 2003); *Her v. Comm'r of Soc. Sec.,* 203 F.3d 388, 389-90 (6th Cir. 1999). Substantial evidence is defined as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)); *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007); *Le Master v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976) (quoting Sixth Circuit opinions adopting language substantially similar to that in *Richardson*).

12

A reviewing court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *See, e.g., Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Court must accept the ALJ's explicit findings and determination unless the record as a whole is without substantial evidence to support the ALJ's determination. 42 U.S.C. § 405(g). *See, e.g., Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984).

The Commissioner must employ a five-step evaluation process in determining the issue of disability. *See, e.g., Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (citing *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). The original burden of establishing disability is on the plaintiff, and impairments must be demonstrated by medically acceptable clinical and laboratory diagnostic techniques. *See* 42 U.S.C. § 1382c(a)(3)(D); 20 C.F.R. §§ 404.1512(a), (c), 404.1513(d). First, the plaintiff must show that she is not engaged in "substantial gainful activity" at the time she seeks disability benefits. *Id.* (citing 20 C.F.R. §§ 404.1520(b), 416.920(b)); *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6th Cir. 2007). A plaintiff who is performing substantial gainful activity is not disabled no matter how severe the plaintiff's medical condition may be. *See, e.g., Dinkel v. Sec'y of Health & Human Servs.*, 910 F.2d 315, 318 (6th Cir. 1990).

Second, the plaintiff must show that she suffers from a severe impairment that meets the twelve month durational requirement. 20 C.F.R. § 404.1520(a)(4)(ii). *See Edwards v. Comm'r of Soc. Sec.*, 113 Fed. Appx. 83, 85 (6th Cir. Sept. 24, 2004). A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Barnhart v. Thomas*, 540 U.S. 20, 24, 124 S.Ct. 376, 157 L.Ed.2d 333 (2003) (citing 20 C.F.R. §§ 404.1520(c), 416.920(c)). Basic work activities are "the abilities and aptitudes necessary to do most jobs," such

13

as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; [c]apacities for seeing, hearing, and speaking; [u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]esponding appropriately to supervision, co-workers and usual work situations; and [d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b). The Commissioner is required to consider the combined effects of impairments that individually are not severe but cumulatively may constitute a severe impairment. 42 U.S.C. § 423(d)(2)(B); *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

Third, if the plaintiff is not engaging in substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment meets or equals a listed impairment, the plaintiff is presumed disabled without further inquiry, regardless of age, education or work experience. *Id.* (citing 20 C.F.R. §§ 404.1520(d), 416.920(d)). The plaintiff may establish that she meets or equals a listed impairment, and that the impairment has lasted or is expected to last for at least twelve months or result in death. *See Listenbee v. Sec'y of Health & Human Servs.*, 846 F.2d 345, 350 (6th Cir. 1988). The plaintiff is not required to show the existence of a listed impairment in order to be found disabled, but such a showing results in an automatic finding of disability. *See Blankenship v. Bowen*, 874 F.2d 1116, 1122 (6th Cir. 1989).

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, she is not disabled. *Id.* The plaintiff has the burden of proving inability to perform past relevant work, or proving that a particular past job should not be considered relevant. *Cruse*, 502 F.3d at 539; *Jones*, 336 F.3d at 474 ("Through step four, the [plaintiff] bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from

14

performing her past relevant work"); *Smith v. Sec'y of Health & Human Servs.*, 893 F.2d 106, 109 (6th Cir. 1989). If the plaintiff fails to carry this burden, she must be denied disability benefits.

Once the plaintiff establishes a *prima facie* case that she is unable to perform her prior relevant employment, the burden shifts in step five to the Commissioner to show that the plaintiff can perform other substantial gainful employment, and that such employment exists in significant numbers the national economy. *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (quoting *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir.1997)). *See, e.g., Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). To rebut a *prima facie* case, the Commissioner must come forward with proof of the existence of other jobs a plaintiff can perform. *Longworth*, 402 F.3d at 595. *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957, 103 S.Ct. 2428, 77 L.Ed.2d 1315 (1983) (upholding the validity of the medical-vocational guidelines grid as a means for the Commissioner of carrying his burden under appropriate circumstances). It remains the plaintiff's burden to prove the extent of her functional limitations. *Her*, 203 F.3d at 391. Even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in significant numbers in the national economy that the plaintiff can perform, she is not disabled. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009); *Her*, 203 F.3d at 391. *See also Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028-29 (6th Cir. 1990); *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 88-89 (6th Cir. 1985); *Mowery v. Heckler*, 771 F.2d 966, 969-70 (6th Cir. 1985).

If the question of disability can be resolved at any point in the sequential evaluation process, the claim is not reviewed further. 20 C.F.R. § 404.1520(a)(4). *See also Higgs v. Bowen*, 880 F.2d

860, 863 (6th Cir. 1988) (holding that resolution of plaintiff's claim at step two of the evaluative process is appropriate in some circumstances).

**B. The five step inquiry**

In this case, the ALJ resolved the plaintiff's case at step four of the five-step process. (Tr. 13.) At step one, the ALJ found that the plaintiff had not been engaged in substantial gainful activity since the alleged onset date of August 15, 2004. (Tr 12.) At step two, the ALJ determined that the plaintiff's fibromyalgia and asthma were severe impairments. *Id.* At step three, the ALJ concluded that the plaintiff's impairments, either singly or in combination, did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, and that she had the RFC to perform medium work but should avoid concentrated exposure to dust, fumes, smoke, chemicals, or noxious gases. (Tr. 13.) At step four, the ALJ found that the plaintiff could perform her past relevant work as a sewing machine operator. (Tr. 15.)

**C. Plaintiff's Assertions of Error**

The plaintiff contends that the ALJ "failed to provide good reasons for rejecting the opinions of Dr. Clements, her treating physician. Docket Entry No. 13, at 8-11. She also argues that the ALJ erred in evaluating her subjective complaints of pain and in concluding that she could return to her past relevant work. Docket Entry No. 13, at 11-15.

16

**1. The ALJ properly assessed the medical findings of Dr. Clements, the plaintiff's treating physician.**

The plaintiff contends that the ALJ "failed to provide good reasons for rejecting the opinions of Dr. Clements, her treating physician." Docket Entry No. 13, at 8-11. Given the regularity with which Dr. Clements examined the plaintiff (tr. 583-604), he is classified as a treating source under 20 C.F.R. § 404.1502.[10]

Generally, an ALJ is required to give "controlling weight" to the medical opinion of a treating physician, as compared to the medical opinion of a non-treating physician, if the opinion of the treating source is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2), 416.927(d)(2) (quoted in *Tilley v. Comm'r of Soc. Sec.*, 394 Fed.Appx. 216, 222 (6th Cir. Aug. 31, 2010), and *Hensley v. Astrue*, 573 F.3d 263, 266 (6th Cir. 2009)). This is commonly known as the treating physician rule. *See* Soc. Sec. Rul. 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson*, 378 F.3d at 544 (6th Cir. 2004).

---

[10] A treating source is the plaintiff's own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you. Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s). We may consider an acceptable medical source who has treated or evaluated you only a few times or only after long intervals (e.g., twice a year) to be your treating source if the nature and frequency of the treatment or evaluation is typical for your condition(s).

20 C.F.R. §§ 404.1502, 416.902.

17

The ALJ did not assign controlling weight to Dr. Clements's Crohn's and Colitis RFC assessment. (Tr. 14-15.) Even if a treating source's medical opinion is not given controlling weight, it is "still entitled to deference and *must be weighed using all of the factors provided in 20 C.F.R. 404.1527 . . . ." Fisk v. Astrue*, 253 Fed.Appx. 580, 585 (6th Cir. Nov. 9, 2007) (quoting Soc. Sec Rul. 96-2p, 1996 WL 374188, at *4) (emphasis in original). The ALJ must consider

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the supportability of the opinion with respect to relevant evidence such as medical signs and laboratory findings; (4) the consistency of the opinion with the record as a whole; (5) the specialization of the physician rendering the opinion; and (6) any other factor raised by the applicant.

*McGrew v. Comm'r of Soc. Sec.*, 343 Fed.Appx. 26, 30 (6th Cir. Aug. 19, 2009) (citing *Wilson*, 378 F.3d at 544); *Meece v. Barnhart*, 192 Fed.Appx. 456, 461 (6th Cir. Aug. 8, 2006) (quoting 20 C.F.R. § 404.1527(d)(2)-(6)). The ALJ must also provide "good reasons" for the resulting weight given to the treating source. Soc. Sec Rul. 96-2p, 1996 WL 374188, at *5 (citing 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011); *Brock v. Comm'r of Soc. Sec.*, 2010 WL 784907, at *2 (6th Cir. Mar. 8, 2010). The "good reasons" must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight," *Cole*, 661 F.3d at 937 (quoting Soc. Sec Rul. 96-2p, 1996 WL 374188, at *5), and so that the plaintiff understands the disposition of her case. *Wilson*, 378 F.3d at 544 (citing *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)).

The ALJ focused on supportability and on the plaintiff's activities of daily living in concluding that Dr. Clements's Crohn's and Colitis RFC assessment should be assigned "[l]ittle

18

weight." (Tr. 14-15.)  The ALJ explained that "[l]ittle weight is given to Dr. Clement's residual functional capacity assessment.  It is inconsistent with objective findings that show an improvement in spasms and only residual heartburn.  His assessment is also inconsistent with the claimant's reported activities of daily living, which shows a higher level of functioning." *Id.*

In his Crohn's and Colitis RFC assessment (tr. 576-80), Dr. Clements diagnosed the plaintiff with esophageal spasms, esophagitis, and atypical chest pains. (Tr. 576.) He noted that the plaintiff's long term prognosis was fair and that her symptoms included abdominal pain and cramping that radiated up her chest, malaise, and fatigue and often were severe enough to interfere with her attention and concentration but that she was capable of tolerating low stress jobs. (Tr. 576-578.) Dr. Clements determined that the plaintiff could walk less than one block without resting, stand for five minutes at one time, and stand/walk less than two hours in an eight hour workday; was able to sit for thirty minutes at one time; and "need[ed] a job which permits shifting positions at will from sitting, standing or walking" and "ready access to a restroom." (Tr. 578-79.) He found that the plaintiff would need to lie down "daily" at work, could occasionally lift/carry ten pounds, should never climb ladders and rarely twist or climb stairs, could occasionally stoop or crouch, and would miss more than four days of work per month. (Tr. 579-80.)

However, objective medical testing, Dr. Clements's own treatment notes, and the plaintiff's reported activities of daily living belie the severity of the restrictions that he assigned the plaintiff in his RFC assessment. First, although Dr. Clements diagnosed the plaintiff with esophageal spasms, esophagitis, and atypical chest pains, a September 2009, EGD showed that the plaintiff had moderately severe gastritis and minimal reflux esophagitis. (Tr. 602.) Next, in December of 2009, and February of 2010, the plaintiff related to Dr. Clements that her esophageal spasms were "better"

19

and that she was having only "some heartburn and abdominal pain." (Tr. 583-87.) Simply put, there is nothing in Dr. Clements's treatment notes that indicates that the plaintiff's esophageal spasms, esophagitis, and atypical chest pains significantly impair her ability to function. Finally, the plaintiff related that she is able to cook, clean, vacuum, do laundry, shop for groceries, fish, and attend her daughter's athletic events.[11] (Tr. 156-59, 192.)

In sum, Dr. Clements's Crohn's and Colitis RFC assessment was not supported by his own treatment notes or the objective medical evidence in the record. Therefore, the ALJ did not err in assigning "little weight" to his findings. (Tr. 14-15.) He focused on the factors of supportability and on the plaintiff's activities of daily living, provided "good reasons," as required by SSR 96-2p, 1996 WL 374188, at *5 (citing 20 C.F.R. § 404.1527(d)(2)), and there is substantial evidence in the record to support his determination.

### 2. The ALJ properly evaluated the plaintiff's subjective complaints of pain.

The plaintiff argues that the ALJ erred in evaluating the credibility of her subjective symptoms. Docket Entry 13, at 11-14. The ALJ is charged with evaluating the credibility of the plaintiff at the hearing, and the ultimate decision of credibility rests with the ALJ. The ALJ's credibility finding is entitled to deference "because of the ALJ's unique opportunity to observe the claimant and judge her subjective complaints." *See Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001) (internal citations omitted). However, "[i]f the ALJ rejects the claimant's complaints as

_____

[11] Although in December of 2008, the plaintiff noted that she was unable to do any yard work (Tr. 190), Dr. McLerran reported six months earlier that the plaintiff "[w]ants pain meds. Needs while putting up garden" (tr. 393, 399), to which the ALJ alluded. (Tr. 14-15.)

20

incredible, he must clearly state his reasons for doing so." *Wines v. Comm'r of Soc. Sec.*, 268 F. Supp.2d 954, 958 (N.D. Ohio 2003) (citing *Felisky*, 35 F.3d at 1036).

Social Security Ruling 96-7p emphasizes that credibility determinations must find support in the record, and not be based upon the "intangible or intuitive notion[s]" of the ALJ. 1996 WL 374186, at *4. In assessing the plaintiff's credibility, the ALJ must consider the record as a whole, including the plaintiff's complaints, lab findings, information provided by treating physicians, and other relevant evidence. *Id.* at *5. Consistency between the plaintiff's subjective complaints and the record evidence "tends to support the credibility of the claimant, while inconsistency, although not necessarily defeating, should have the opposite effect." *Kalmbach v. Comm'r of Soc. Sec.,* 2011 WL 63602, at *11 (6th Cir. Jan. 7, 2011). The ALJ must explain his credibility determination such that both the plaintiff and subsequent reviewers will know the weight given to the plaintiff's statements and the reason for that weight. Soc. Sec. Rul. 96-7p, 1996 WL 374186, at *4.

Both the SSA and the Sixth Circuit have enunciated guidelines for use in analyzing a plaintiff's subjective complaints of pain. *See* 20 C.F.R. § 404.1529; *Vance v. Comm'r of Soc. Sec.*, 260 Fed.Appx. 801, 806 (6th Cir. Jan. 15, 2008) (citing *Arnett v. Comm'r of Soc. Sec.*, 76 Fed.Appx. 713, 716 (6th Cir. Sept. 23, 2006)); *Walters v. Comm'r of Soc.* Sec., 127 F.3d 525, 531 (6th Cir. 1997); Felisky, 35 F.3d at 1037. While the inquiry into subjective complaints of pain must begin with the objective medical record, it does not end there. The Sixth Circuit in *Duncan v. Sec'y of Health and Human Servs.*, 801 F.2d 847 (6th Cir. 1986), set forth the basic standard for evaluating such claims.[12] The *Duncan* test has two prongs. The first prong is whether there is objective medical

---

[12] Although *Duncan* only applied to determinations made prior to 1987, the Sixth Circuit has since held that *Duncan* continues to apply to determinations made after 1987. *See Felisky*, 35 F.3d at 1039 n.2.

21

evidence of an underlying medical condition. *Vance*, 260 Fed.Appx. at 806 (citing *Arnett*, 76

Fed.Appx. at 716)); *Walters*, 127 F.3d at 531; *Felisky*, 35 F.3d at 1039 (quoting *Duncan*, 801 F.2d

at 853). The second prong has two parts: "(1) whether objective medical evidence confirms the

severity of the alleged pain arising from the condition; or (2) whether the objectively established

medical condition is of such a severity that it can reasonably be expected to produce the alleged

disabling pain." *Id.* This test does not require objective evidence of the pain itself. *Duncan*, 801 F.2d

at 853 (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3rd Cir. 1984)).

In this case, the ALJ concluded that the plaintiff's "medically determinable impairments

could reasonably be expected to cause the alleged symptoms," thus satisfying the first prong of the

*Duncan* test. (Tr. 15.) Given that the second prong of the *Duncan* test consists of two alternatives,

the plaintiff must only meet one of the following two elements: the objective medical evidence

"confirms the severity of the alleged pain arising from the condition" or the "objectively established

medical condition is of such a severity that it can reasonably be expected to produce the alleged

disabling pain." The SSA provides a checklist of factors to assess symptoms, including pain, in

20 C.F.R. § 404.1529(c). The ALJ cannot ignore a plaintiff's statements detailing the symptoms,

persistence, or intensity of her pain simply because current objective medical evidence does not fully

corroborate the plaintiff's statements. 20 C.F.R. § 404.1529(c)(2). Besides reviewing medical

records to address the credibility of a plaintiff's symptoms of pain, an ALJ must review the entire case record in light of the seven factors set forth in 20 C.F.R. § 404.1529(c)(3).[13]

In making his credibility determination in this case, the ALJ relied on objective diagnostic testing, the plaintiff's activities of daily living, and medical records from examining sources. (Tr. 15.) The ALJ concluded that

> [t]he testimony of the claimant is not fully credible concerning the severity of her symptoms and the extent of her limitations. Neither the severity nor the extent is supported by the objective medical evidence of record. She testified to shortness of breath, but continues to smoke 2-3 packs of cigarettes per day. The claimant reported neck and back pain, but x-rays of the cervical and lumbar spine were normal. MRI of the lumbar spine showed mild degenerative and disc space changes, but no stenosis or nerve root impingement. Treatment records consistently showed negative straight leg raises, intact sensation, normal strength, and gait within normal limits. Records also showed the claimant was able to garden and do chores. The claimant reported limited activities of daily living, but function reports indicate the ability to vacuum, mop, do laundry, shop for groceries and household supplies, wash dishes, cook, and watch her child's softball games.

*Id.* (Citations to record omitted).

A June 2006, CT scan of the plaintiff's lumbar spine revealed "[m]ild osteoarthritis" and a x-ray of her lower spine showed "minimal degenerative changes at the level of L3 and L5." (Tr. 235.) A June 2007, CT scan of her lumbar spine was "[n]ormal." (Tr. 360.) March 2008, x-rays of her cervical and lumbar spine were "[n]ormal." (Tr. 444.) A June 2008, MRI of her lumbar spine

---

[13] The seven factors under 20 C.F.R. § 404.1529(c)(3) include: (i) the plaintiff's daily activities, (ii) the location, duration, frequency, and intensity of the plaintiff's pain or other symptoms, (iii) precipitating and aggravating factors, (iv) the type, dosage, effectiveness and side effects of any medication the plaintiff takes or has taken to alleviate pain or other symptoms, (v) treatment, other than medication, plaintiff received or has received for relief of pain or other symptoms, (vi) any measures plaintiff uses or has used to relieve pain or other symptoms (e.g. lying flat on her back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.), and (vii) other factors concerning plaintiff's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3).

revealed "[m]ild degenerative bony and disc space changes" and "[n]o evidence of any canal stenosis or nerve root impingement." (Tr. 404.) Treatment notes from Dr. McLerran and Dr. Gaspar indicated that the plaintiff had moderate bilateral tenderness and "moderately reduced" spine-flexion and extension in her lumbar spine, negative straight leg raises, a normal gait, a normal range of motion in her upper and lower extremities, and normal strength and a normal range of motion in her spine. (Tr. 391, 395, 401, 414, 418, 422, 426, 431, 433, 438.) Finally, the plaintiff related that she is able to cook, clean, vacuum, do laundry, shop for groceries, fish, and attend her daughter's athletic events. (Tr. 156-59, 192.)

In sum, the objective diagnostic testing, treatment notes from examining physicians, and the plaintiff's activities of daily living indicates that her physical impairments cause her a certain amount of pain, but that same record medical evidence does not support her subjective complaints that her pain is disabling.

The plaintiff also argues that the ALJ erred in evaluating Dr. Cox's Fibromyalgia RFC assessment and "ignor[ed] the holdings that no objective tests are used to diagnose fibromyalgia, and the disease itself is inherently based on subjective complaints." Docket Entry No. 13, at 14.

The Sixth Circuit has recognized that there is significant difficulty in diagnosing fibromyalgia.[14] *Huffaker v. Metro. Life Ins. Co.*, 271 Fed.Appx. 493, 2008 WL 822262, *6 n.2 (6th

---

[14] The Court of Appeals for the Sixth Circuit has cited the Seventh Circuit with approval in describing the difficulties in diagnosing fibromyalgia:

> [F]ibromyalgia, also known as fibrositis[,] is a common, but elusive and mysterious disease, much like chronic fatigue syndrome, with which it shares a number of features. Its cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective. There are no laboratory tests for the presence or severity of fibromyalgia. The principal symptoms are "pain all over," fatigue, disturbed sleep, stiffness, and-the only symptom that discriminates between it and other diseases of a rheumatic character-multiple tender

24

Cir. Mar. 25, 2008). Specifically, fibromyalgia is "difficult to confirm through objective testing since fibromyalgia patients generally present few or no objectively alarming signs." *Lyons v. Astrue*, 2009 WL 2515625, at *11 (M.D. Tenn. Sept. 10, 2008) (Wiseman, J.) (citing *Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815, 820 (6th Cir.1988) (per curiam) (objective tests are of little relevance in determining the existence or severity of fibromyalgia), and *Swain v. Comm'r of Soc. Sec.*, 297 F. Supp.2d 986, 990 (N.D. Ohio 2003) ("[f]ibromyalgia is an 'elusive' and 'mysterious' disease" which causes "severe musculoskeletal pain")). The Sixth Circuit has also found that "'[t]he process of diagnosing fibromyalgia includes (1) the testing of a series of focal points for tenderness and (2) the ruling out of other possible conditions through objective medical and clinical trials.'" *Lyons*, 2009 WL 2515625 at *11 (quoting *Rogers v. Comm'r of Social Sec.*, 486 F.3d 234, 244 (6th Cir.2007)). However, "*a diagnosis* of fibromyalgia does not automatically entitle [the plaintiff] to disability benefits." *See Vance v. Comm'r of Soc. Sec.*, 260 Fed.Appx. 801, 806 (6th Cir. 2008) (emphasis in original) (citing *Sarchet v. Chater*, 78 F.3d 305 (7th Cir. 1996) ("Some people may have a severe case of fibromyalgia as to be totally disabled from working . . . but most do not and the question is whether [the plaintiff] is one of the minority.").

The plaintiff was first diagnosed with fibromyalgia by Dr. McLerran in August of 2008 (tr. 391) and again in January of 2010, by Dr. Cox.[15] (Tr. 571.) Dr. Cox noted that she had "some

---

spots, more precisely 18 fixed locations on the body (and the rule of thumb is that the patient must have at least 11 of them to be diagnosed as having fibromyalgia) that when pressed firmly cause the patient to flinch.

*Huffaker*, 271 Fed.Appx. 493, 500, 2008 WL 822262, at *6 n.2 (quoting *Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 916 (7th Cir. 2003).

[15] There is no indication in the record that either Dr. McLerran or Dr. Cox are rheumatologists or other specialists in fibromyalgia or that the plaintiff was ever referred to such a specialist.

25

difficulty" standing on her heels and toes and balancing on either foot, "no deterioration in range of motion," and "significant problems with subjective pain on movement but no other visible deformities." *Id.* He then completed a Fibromyalgia RFC assessment (tr. 572-75) and found that the plaintiff met the American College of Rheumatology criteria for fibromyalgia, was not expected to improve, and had multiple trigger points on exam, and that her symptoms included multiple tender points, chronic fatigue, morning stiffness, muscle weakness, and anxiety. (Tr. 572.) He determined that the plaintiff had moderate bilateral pain in her lumbosacral spine, cervical spine, thoracic spine, chest, shoulders, hips, legs, knees, ankles, and feet, and that this pain was precipitated by stress, fatigue, movement, overuse, and cold. (Tr. 573.) Dr. Cox described plaintiff's pain as severe enough that it would frequently interfere with the attention and concentration needed to perform simple work tasks in a typical workday but concluded that plaintiff could tolerate moderate stress at work. *Id.*

Dr. Cox found that the plaintiff could walk one half of a city block before needing to rest or experiencing severe pain; was able to sit for 30 minutes "before needing to get up;" could stand for 15 minutes "before needing to sit down [or] walk around;" could stand/walk about two hours and sit at least six hours in an eight hour day; needed to walk around every 30 minutes for at least five minutes each time; needed "a job that permits shifting positions at will from sitting, standing or walking; and she would have to take unscheduled breaks "every hour as needed" that last for 15 minutes each time. (Tr. 574.) Dr. Cox concluded that the plaintiff could lift/carry less than ten pounds frequently and ten pounds occasionally; could rarely twist, stoop, crouch, squat, and climb ladders or stairs; could occasionally look down, turn her head left or right, look up, or hold her head in a "static position;" had no "significant limitations with reaching, handling, or fingering;" and would be absent from work "[a]bout four days per month." (Tr. 575.)

26

The severity of Dr. Cox's Fibromyalgia RFC assessment is not supported by his own note in which he indicated that, while the plaintiff had "significant problems with subjective pain on movement," she exhibited "no deterioration in range of motion" and no "redness, warmth, synovitis or effusion" in her joints. (Tr. 571.) It appears that the ALJ gave short shrift to Dr. Cox's evaluation in part because he evaluated the plaintiff on behest of her attorney. (Tr. 14.) While plaintiff's counsel's arranging an evaluation is no less legitimate than the SSA's arranging consultative evaluations, the ALJ did explain that Dr. Cox's notes (tr. 571) are inconsistent with his evaluation and that his evaluation was largely based on the plaintiff's subjective complaints (tr. 14), which the ALJ found to be not fully credible in light of other treatment records and the plaintiff's activities of daily living. Dr. Cox's 2008 RFC assessment is also inconsistent with Dr. Lemeh's July 31, 2009, RFC assessment and her review of the plaintiff's medical records, upon which the ALJ relied. (Tr. 15, 448-55.)

### 3. The ALJ properly determined that the plaintiff could return to her past relevant work.

The plaintiff argues that the ALJ erred in concluding that she could return to her past relevant work as a sewing machine operator. Docket Entry No. 13, at 15. Specifically, she contends that the ALJ failed to properly consider the RFC assessments of Dr. Clements and Dr. Cox and did not "even mention the side effects" of her prescribed Phenergan. *Id.*

An individual's RFC is "a medical assessment of what that individual can do in a work setting in spite of functional limitations and environmental restrictions imposed by all of his medically determinable impairments," *Woods v. Comm'r of Soc. Sec.*, 2009 WL 3153153, at *8 (W.D. Mich. Sept. 29, 2009) (citing 20 C.F.R. § 404.1545), and the ALJ has complete authority to

make a RFC determination. *See* 20 C.F.R. §§ 404.1546(c), 416.946(c) ("If your case is at the administrative law judge hearing level or at the Appeals Council review level, the administrative law judge or the administrative appeals judge at the Appeals Council (when the Appeals Council makes a decision) is responsible for assessing your residual functional capacity."). *See also Poe v. Comm'r of Soc. Sec.*, 342 Fed.Appx. 149, 157 (6th Cir. Aug. 18, 2009); *Ford v. Comm'r of Soc. Sec.*, 114 Fed.Appx. 194, 197 (6th Cir. Nov. 10, 2004). While an ALJ should not "substitute his opinion for that of a physician," he is also "not required to recite the medical opinion of a physician verbatim in his residual functional capacity finding." *Poe*, 342 Fed.Appx. at 157 (citing 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3)). Further, "an ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual capacity finding." *Poe*, 342 Fed.Appx. at 157 (citing *Ford*, 114 Fed. Appx. at 197).

As discussed *supra*, the ALJ properly assigned "[l]ittle weight" to Dr. Cox's and Dr. Clements's RFC assessments (tr. 14) and substantial evidence in the record supports his determinations. The ALJ also took into account the plaintiff's "described sleepiness due to her medications" in making his RFC determination. (Tr. 14.) Given the ALJ's analysis of the plaintiff's RFC, it is clear that he carefully considered all the record evidence and properly concluded that the plaintiff retained the ability to perform her past relevant work as a sewing machine operator. (Tr. 13-15.)

The plaintiff raised three allegations of error, and the Court has addressed each of these in turn. However, the Court is perplexed by the defendant's consideration of two additional issues. Docket Entry No. 18, at 16-19. Although the defendant cites to pages 23-27 of the plaintiff's memorandum in support of her motion, her motion is only 16 pages long. The plaintiff did not raise

28

an issue about the VE's testimony. In addition, the defendant addressed the issue of the plaintiff's credibility twice. The second time (Docket Entry No. 18, at 18), the defendant cited to the list of exhibits in the record rather than to the ALJ's opinion. It appears that the defendant inadvertently "cut and pasted" a portion of another memorandum involving another claimant.

## V. RECOMMENDATION

For the above stated reasons, it is recommended that the plaintiff's motion for judgment on the administrative record (Docket Entry No. 12) be DENIED and that this action be DISMISSED.

Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this Report and Recommendation and must state with particularity the specific portions of the Report and Recommendation to which objection is made. Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's Order regarding the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

JULIET GRIFFIN
United States Magistrate Judge

29